UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| RICHARD NICEVSKI, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CIVIL NO. 1:16cv42 |
|  | ) |  |
| CAROLYN COLVIN, Acting | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social Security Act. 42 U.S.C. §416(I). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield, supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since May 10, 2011, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: chronic obstructive pulmonary disease; osteopenia; obesity, substance abuse (cocaine, marijuana, and alcohol) and degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except lift/carry 20 pounds occasionally, less than 10 pounds frequently, stand/walk 2 hours and sit 8 hours. The claimant needs a job that can be performed primarily seated, could occasionally stand if needed and stand/walk short periods, 10 to 15 minutes. The claimant could occasionally climb ramps and stairs, balance and stoop. The claimant could never climb ladders, ropes or scaffolds. Only occasional exposure to cold, heat, humidity, fumes, odors, dust, gases and poorly ventilated areas. No exposure to workplace hazards such as unprotected heights or dangerous moving machinery. The claimant could sustain a flexible pace and could tolerate superficial interaction with supervisors, coworkers and the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 22, 1975 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569(a), 416.969, and

>   416.969(a)).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from May 10, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 438-446).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on August 18, 2016  On October 3, 2016, the defendant filed a memorandum in support of the Commissioner's decision, and on October 25, 2016, Plaintiff filed his reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); *accord Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income benefits on September 20, 2012, alleging disability beginning May 10, 2011. The claims were denied initially and on reconsideration, and by an Administrative Law Judge ("ALJ") on July 27, 2014. (AR 436.) Plaintiff requested review by the Appeals Council, but was denied, leaving the ALJ's decision the final decision of the Commissioner of Social Security. (AR 1-4.)

Following the denial of the request for review, Plaintiff filed a new application for Disability Insurance Benefits and Supplemental Security Income benefits. This claim was approved on April 16, 2016, with an onset date of July 28, 2014, the day after the ALJ's denial of benefits in the previous application. Thus, Plaintiff is now seeking an award of benefits from May 11, 2011 through July 27, 2014.

Neither the Plaintiff nor the Commissioner has recited Plaintiff's medical history in their briefs before the court, relying instead on references to the relevant evidence of record as pertinent to the particular arguments raised. The following medical history is summarized from the ALJ's decision. Additional facts will be discussed below as needed.

Records from John Musgrave, Psy.D of Park Center show that he saw the Plaintiff on October 15, 2013 for an initial assessment. Dr. Musgrave noted that the Plaintiff was on probation through Allen County Adult probation for a domestic battery charge from May 2012. Plaintiff reported intense anger issues, jealousy, rage and difficulty controlling it. Plaintiff also noted that he was currently seeking SSI disability. Dr. Musgrave diagnosed Plaintiff as having dysthymic disorder with a global assessment (GAF) of 48, which indicates severe symptoms. However, Plaintiff reported a significant level of family problems, such as frequent arguments,

difficult separation, siblings with significant mental health, developmental or criminal justice problems. The Plaintiff was having some moderate problems with his social functioning.

Plaintiff saw Candace Martin, Psy.D on November 26, 2013 for a consultative examination. Plaintiff told Dr. Martin that he was filing for Social Security Disability Benefits because of breathing problems. Plaintiff stated he was depressed, but reported that a professional had never diagnosed him. However, he stated that he was taking Zyprexa, which did not help his mood. Plaintiff told Dr. Martin that he was feeling down because of his divorce and all his medical problems. Plaintiff reported that he is currently using no medication because he has not had medical insurance since July. Dr. Martin noted that Plaintiff's problems seem to be reflective of dysthymia. Dr. Martin concluded that the Plaintiff's depression does not seem to be of a significant degree such that it would interfere with his ability to work. Dr. Martin reported that Plaintiff has dysthymia due to marital divorce, unemployment, inadequate finances and coping with numerous medical problems. Dr. Martin assessed Plaintiff with a GAF of 55.

Plaintiff saw Latisia Weaver, BSW, and LPN on January 13, 2014. At that time, Plaintiff was reporting worsening depression. Plaintiff described many symptoms including wanting to cry, feelings of sadness, irritability and worrying. However, Plaintiff stated that he was not suicidal. Plaintiff reported that he was currently on Celexa 40 mg because that is all he could afford. Plaintiff stated that he now has insurance and would like a different medication to address his depression.

The psychologists who reviewed the evidence on behalf of the state Agency concluded that Plaintiff's affective disorder and substance abuse disorder are not severe.

Plaintiff testified that he last worked as a truck driver. Plaintiff stated that he quit this job

because he had moments in which he would cough very hard and lose his sight. Plaintiff testified that he has recently been receiving treatment for his back and neck pain from the Centers for Pain Relief. Plaintiff reported that he had injections in his back the day before the hearing. Plaintiff stated he fell off a ladder last fall going up to the attic to get Christmas boxes. Plaintiff also testified that he did difficult jobs in the past that messed up his back.

Plaintiff stated that he receives mental health treatment at Park Center and gets medications from Matthew 25. He further stated that the medications do not help.

Regarding his COPD, plaintiff testified that he is not using oxygen yet, but he may have to be put on oxygen for nighttime. Plaintiff stated that he has problems with choking and sleeping at night. Plaintiff reported that he used to work in a foundry and that might have caused his breathing problems. Plaintiff testified that he had to be hospitalized for breathing related problems two times in the last year. He stated that he had pneumonia and had to stay in the hospital for three days.

Plaintiff saw Dr. H.M. Bacchus on November 28, 2012. Dr. Bacchus reported that Plaintiff's FEV1 improved post-bronchodilator. Plaintiff's FEV1 was 1.16 pre-bronchodilator. However, the FEV1 improved to 1.67 post-bronchodilator. Plaintiff reported to Dr. Bacchus that he was currently out of his prescribed inhalers, which could have contributed to his low FEV1 of 1.16. Dr. Bacchus concluded that Plaintiff retains the functional capacity to perform light to moderate duties. Dr. Bacchus noted that Plaintiff might have difficulty with working in extreme temperatures and repetitive climbing or walking on uneven ground.

Records from Parkview Hospital show that Plaintiff was seen on March 2, 2013 because he was having constant wheezing for several days at a time. Plaintiff was admitted with cough,

7

fever, chills and shortness of breath.  Plaintiff reported that he had two to three episodes per day associated with coughing and dyspnea.  Plaintiff stated that sometimes he falls down and comes close to losing consciousness.  Chest x-ray showed bilateral infiltrates consistent with pneumonia.  Plaintiff improved and was discharged on antibiotics to complete a total of ten days therapy.  Plaintiff was told to follow up with Dr. Smits, who serves as his pulmonologist.

Plaintiff's FEV1 values are low during acute exacerbations.  Plaintiff saw Dr. Smits on April 26, 2011 with complaints of shortness of breath, dry cough and scratchy throat.  Spirometry report showed FEV1 of 1.10 pre-bronchodilator and 1.29 post bronchodilator, which is severe obstruction.  Plaintiff's diagnoses were acute bronchitis and chronic obstructive pulmonary disease.  Plaintiff has a history of chronic obstructive pulmonary disease, bronchitis, pneumonia and emphysema.  A CT-scan of Plaintiff's chest on December 2, 2011 revealed emphysema and air-trapping, stable mild bronchiectasis and patchy capacity in the right lung base.  On February 3, 2012, an examination revealed distant breath sounds.  Plaintiff's FEV1 pre-bronchodilator was 1.16 and post-bronchodilator FEV1 was 1.41.  Dr. Smits' assessment was COPD with acute exacerbation and chronic bronchitis.  On September 4, 2013, Plaintiff had complaints of cough, wheezing, shortness of breath and stuffy nose.  Plaintiff underwent a pulmonary function study at Matthew 25 on September 4, 2013.  Plaintiff's pre-bronchodilator FEV1 value was 1.39 and 1.61 post-bronchodilator.  Plaintiff's physical examination showed severe COPD.  Dr. Smits reported on November 6, 2013 that Plaintiff had cold symptoms and had reported coughing and occasional shortness of breath.  At that visit, Dr. Smits diagnosed Plaintiff with chronic bronchitis.

Plaintiff was admitted to Parkview Hospital on September 20, 2013 for acute COPD exacerbation with asthma and hypertension. Plaintiff was in respiratory distress with wheezes, but

no rales. Plaintiff denied palpitations, dizziness, or lightheadedness. There were no neurological symptoms, and no nausea, vomiting, diarrhea or abdominal pain. A review of the system was unremarkable. The treating physician noted that Plaintiff continued to smoke, but he was down to one-half pack of cigarettes per day. Plaintiff was given oxygen, nebulizer, steroids and antibiotics. Plaintiff's condition improved and he was discharged on September 25, 2013.

The medical evidence shows that Plaintiff went to Parkview North Hospital on December 14, 2011 for non-traumatic lower leg pain and hip pain. Plaintiff reported that this was an injury to the left lateral thigh. According to Plaintiff, the onset was sudden and had been increasing. Examination of Plaintiff's left hip revealed only a mild amount of redness over the greater trochanteric region. There was minimal to no pain on axial loading of the hip socket. There was minimal to no pain on range of motion testing. There was no pain on muscle strength testing. The attending physician, Dr. Christian Bridgewater, reported that x-rays of Plaintiff's hip revealed no acute findings. Plaintiff was discharged because his condition was much improved and Plaintiff reported that he was feeling better.

Plaintiff saw Dr. William Hedrick of the Center for Pain Relief on February 11, 2014. Prior to this visit, Plaintiff saw Kelly Anderson, NP in January 2014 for lower back pain. At that time, Plaintiff denied radiation of the pain. However, Plaintiff rated his pain as nine on a one to ten scale. Plaintiff stated that pain gets as bad as ten on a one to ten scale. Plaintiff described the pain as burning, stabbing, throbbing and aching. Plaintiff stated that his pain was constant throughout the day with varying levels of severity. According to Plaintiff, the pain is decreased by prescription medication. Increased movement or activity aggravates the pain. Plaintiff ambulated without an assistive device. Plaintiff's gait was stable and normal. Plaintiff was

prescribed Baclofen and Plaintiff reported a seventy percent relief in pain and a fifteen percent increase in functionality with medications. On February 11, 2014, Dr. Hedrick performed bilateral sacroiliac joint steroid injections. Plaintiff's postoperative diagnosis was bilateral sacroiliac arthropathy.

In support of remand or reversal, Plaintiff first argues that the ALJ did not properly evaluate his chronic obstructive pulmonary disease (COPD). Plaintiff argues that the ALJ did not discuss whether Listing 3.03 was met, that the ALJ erred by not getting an opinion from a medical expert regarding medical equivalence of a listed impairment, and that the ALJ did not properly account for limitations from COPD in the residual functional capacity assessment.

A person meets Listing 3.03 for asthma if there are attacks once every two months, or six times in a year, which require physician intervention. 20 CFR Part 404, Subpart P, Appendix 1, Rule 3.03. The introduction to the listings explains that attacks include exacerbations of chronic asthmatic bronchitis or pneumonia. 20 CFR Part 404, Subpart P, Appendix 1, Rule 3.00(C).

In the present case, Plaintiff was diagnosed with chronic obstructive asthma. Plaintiff argues that it appears from the record that he met the listing criteria for the period beginning March 2, 2013. He had acute exacerbations on March 2-4, 2013 (a two-night hospital stay which counts as two attacks under 3.00(C)) (AR 971-75), May 2, 2013 (AR 1001, nebulizer treatment was performed), July 17, 2013 (AR 1020-21, nebulizer treatment was performed) and September 20-25, 2013, (a five-night hospital stay which counts as two attacks). (AR 854-90.)

Plaintiff points out that the ALJ failed to even mention Listing 3.03 in the decision. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v.*

*Barnhart*, 381 F.3d 664 (7th Cir. 2004), citing *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir.2002); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir.2003); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002); cf. *Blundell v. Colvin*, 2016 WL 4150887 (N.D.Ind., Aug. 5, 2016) (reversing where ALJ mentioned Listing 3.03 in the decision, but failed to mention Listing 3.02, and did not analyze evidence which could have led to a conclusion that the claimant met Listing 3.02); *see also A.D.B. ex rel. Burnett v. Colvin*, 2014 WL 4804266 *3 (S.D.Ind., Sep. 26, 2014) ("Because the ALJ did not name the listing and did not mention the requirements for that listing, the court cannot conclude that the ALJ analyzed the listing.") In the present case, the ALJ did not mention the listing by name, and did not offer any analysis. Further, regarding the listings generally, the ALJ stated that she relied on the opinions of the State agency doctors, but the last State agency review was done on March 22, 2013.

In response to the Plaintiff's argument, the Commissioner fails to cite to any analysis by the ALJ concerning Listing 3.03. Rather, the Commissioner argues that even if the ALJ had looked at the evidence and provided an analysis, the answer would be that Plaintiff does not meet the listing. However, the Commissioner has not convinced this court that, if this case were remanded, and Listing 3.03 properly considered, Plaintiff would be found to be not disabled. This is because, as Plaintiff points out, the evidence submitted between the last State agency doctor's review and the ALJ's decision showed a significant worsening of Plaintiff's condition. Therefore, The ALJ's failure to properly evaluate Listing 3.03 warrants remand of the ALJ's decision. *Barnett*, 381 F.3d 664.

In addition to improperly evaluating whether Plaintiff's impairments met a listed impairment, the ALJ did not properly evaluate whether Plaintiff's conditions were medically

equal in severity to a listed impairment. A claimant can equal a listing where he does not exhibit one or more of the findings required by the listing, yet his condition overall equals the severity of the listing. 20 CFR 404.1526(a)(1)(i)(B). A finding that a claimant equals a listing requires a medical opinion; it is not a determination that an ALJ is permitted to make on her own. *See* SSR 96-6p (when new evidence is submitted that may support a finding that the claimant's condition equals a listing, ALJ must call on a medical expert); *see also Barnett*, 381 F.3d at 670 (reversing where ALJ did not solicit an opinion from a medical expert regarding medical equivalence, stating, "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *see also Cirelli v. Astrue*, 751 F.Supp.2d 991, 1004-05 (N.D.Ill. 2010) (reversing where ALJ did not get a medical opinion on medical equivalence after updated evidence was submitted); *accord Staggs v. Astrue*, 781 F.Supp.2d 790, 794–95 (S.D.Ind.2011); *Ivey v. Astrue*, 2012 WL 951481 *12-15 (N.D.Ind., Mar.20, 2012).

In the present case, the ALJ did not have a medical expert testify at the hearing, and did not obtain an updated medical opinion. The ALJ relied on the opinions of the State agency reviewing doctors, stating that they opined that Plaintiff's impairments did not medically equal a listed impairment. However, the last agency review was done March 22, 2013, and the doctor only saw the evidence through Exhibit 6F, from AR 686 through AR 753. First, as discussed above, the State agency doctors did not have access to evidence showing six attacks over a period of 12 months. Further, the State agency doctors did not have access to several test results showing listing-level FEV1 values: May 1, 2013 – 1.51 (AR 1045), May 20, 2013 – FEV1 1.34 (AR 1046), September 3, 2013 – FEV1 1.35 (AR 949). *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir 2014) (remanding where the ALJ "fatally" failed to submit significant evidence to state

12

agency consultants, or other medical sources, for review). Even though Plaintiff's FEV1 values were not consistently below listing level, a medical expert could nonetheless opine that Plaintiff's condition overall was equal in severity to a listed impairment, particularly in light of evidence showing frequent severe attacks. The State agency doctors also did not see other strong evidence favorable to Plaintiff's claim. For example, when CT results of the chest taken April 17, 2014, Adam Gregory, M.D. stated that Plaintiff had "extensive chronic/emphysematous changes, which appears more prominent compared to the previous exam from 2008." (AR 1125.)

The State agency reviewing doctors also did not acknowledge obesity as an impairment (AR 482, 493), so they did not appear to take obesity into consideration when evaluating whether Plaintiff's conditions in combination equaled a listing. The introduction to the listing states the following:

> Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

While the ALJ acknowledged that obesity was a severe impairment, as noted above an ALJ cannot make a determination that a claimant's impairments equal a listed impairment, which determination must be made by a doctor. Since the State agency doctors did not indicate that they accounted for obesity in the listings determination, it appears that a doctor did not properly evaluate whether Plaintiff's impairments equaled a listed impairment. SSR 96-6p.

13

Plaintiff next argues that the ALJ did not properly account for limitations from COPD in the residual functional capacity assessment. The ALJ found that Plaintiff could tolerate occasional exposure to humidity, fumes, odors, dust, gases, and poorly ventilated areas. (AR 441.) According to the Administration, occasionally is defined as up to one-third of the workday. Plaintiff claims that this finding is not supported by substantial evidence. Even in the absence of pulmonary irritants, and at rest, Plaintiff had coughing, wheezing, and shortness of breath. After a pulmonary function test on November 28, 2012, he was dizzy, lightheaded, coughing, and wheezing. (AR 747.) A treatment note from March 2, 2013 states that Plaintiff had "constant wheezing several times a day," and he had "coughs and has near-syncope daily where he sometimes falls and sees stars." (AR 918.) A note from January 28, 2014 mentions that Plaintiff had dizziness with cough, and he could not climb the steps in his house due to shortness of breath. (AR 1003.) A note from April 7, 2014 states that he had increased cough and shortness of breath, and he was unable to sleep at night due to cough. (AR 1116.) The record demonstrates that Plaintiff has difficulty breathing even in the absence of pulmonary irritants. The ALJ's conclusion that Plaintiff could be expected to work in an environment with pulmonary irritants for between two and three hours in a workday is not supported by a logical bridge from the evidence to the conclusion. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir.2012); *Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir.2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir.2011).

Next, Plaintiff argues that the ALJ's RFC assessment did not account for all of Plaintiff's limitations. The ALJ relied on the State agency assessment that Plaintiff could perform light work. However, in addition to the limitations not accounted for resulting from respiratory problems, the ALJ did not properly account for Plaintiff's pain. He began treatment at the Centers

for Pain Relief on October 9, 2013, after a fall from a ladder, and the State agency did not have access to this information. (AR 1088.) The initial note mentions that he had pain in the back and neck, and his pain was aggravated by prolonged sitting, standing, and walking. (AR 1088.) On examination on October 11, 2013, he had several positive findings, including decreased and painful range of motion in the cervical spine, and tenderness in the lumbar spine with positive straight leg raise test. (AR 1085.) Pain management records continue until February 11, 2014, generally showing positive findings on examination. (AR 1053-88.) On December 5, 2013, Plaintiff was started on Norco for pain, but by January 3, 2014 Norco was not relieving his pain anymore, and on February 11, 2014 he was prescribed Percocet. (AR 1053.) The ALJ devotes a single paragraph in the decision to discussing Plaintiff's pain, but does not discuss any specific findings, does not note the increase in the type and strength of medication over time, and never explains how this evidence of severe pain affected the residual functional capacity assessment. *See McCristal v. Astrue*, No. 9 C 7044, 2011 WL 2648591, at *10 (N.D. Ill. July 5, 2011) ("The ALJ had no discernable basis on which to quantify Ms. McCristal's RFC after her October 2006 assault. An ALJ 'may not use [his] own lay opinions to fill evidentiary gaps in the record.'"), citing *Suide v. Astrue*, 371 Fed. Appx. 684, 689-90 (7th Cir. 2010).

Further, the ALJ did not provide an evidentiary basis for the residual functional capacity. The ALJ did not rely on any medical opinion in forming the residual functional capacity, as she included greater limitations than those in the opinions of the State agency doctors. (AR 484-86, 508-09.) While an ALJ is not required to base a residual functional capacity assessment solely on medical opinions, the ALJ must provide an evidentiary basis for the findings in the decision, whether that basis be in the form of treatment records, examinations, or the claimant's testimony.

*See Scott*, 647 F.3d at 740, (an ALJ's functional capacity finding cannot stand when the ALJ "did not identify any medical evidence to substantiate her belief" as to the claimant's functional capacity); *see also Bjornson*, 671 F.3d at 649 (ALJ must set forth a supportable record basis for the functional capacity finding). For example, the State agency opined that Plaintiff could stand and walk for six hours per day, but the ALJ never asked Plaintiff how long he was capable of standing and walking, and the ALJ did not cite to anything in the record to support a finding that he was capable of standing and walking for two hours per day, so the record contains no basis for the ALJ's specific finding. The ALJ also found Plaintiff limited to work with a flexible pace and only superficial interaction with supervisors, co-workers, and the public. (AR 441.) The ALJ did not cite to any record evidence which supported these specific limitations, so the basis for the limitations is unclear. Most likely it was due to Plaintiff's mental impairments, though the ALJ never says in the decision. This may appear to be to Plaintiff's benefit, but without knowing what the ALJ based this assessment on, it is impossible to know whether the limitations in the residual functional capacity assessment accurately reflect Plaintiff's limitations. Records show evidence of severe depression, including wanting to cry, irritability, and worrying (AR 962), and depression, agitation, paranoia, hallucinations, anxiety, and memory impairment on examination. (AR 783.) The ALJ's failure to provide a basis for these limitations warrants remand. *Scott,* 647 F.3d at 740; *Bjornson*, 671 F.3d at 649.

Next, Plaintiff argues that the ALJ did not properly evaluate his limitations. The ALJ stated that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, "however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in the

decision." (AR 444.) However, nowhere in the decision does the ALJ explain the reasons for not crediting Plaintiff's allegations. The decision consists of a recitation of Plaintiff's allegations, followed by a recitation of some of the record evidence, then concludes with the statement above.

The ALJ does not undertake the analysis required by SSR 16-3p,1 which involves discussion of several factors, including the claimant's daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of medications, and any other measures the claimant takes to relieve symptoms. The ALJ never asked Plaintiff about any of these factors at the hearing (AR 456-65), and, since she did not question him about these factors, does not discuss them in the decision. (AR 441-44.) *See Kinard v. Colvin*, 2015 WL 2208177 *2 (N.D.Ill., May 7, 2015) ("There is no mention of Plaintiff's testimony, nor any analysis of the credibility factors in SSR 96–7p. To the extent the ALJ believed the cited medical evidence detracted from the veracity of Plaintiff's testimony, he should have said so explicitly and conducted at least a cursory analysis."), citing *Bjornson*, 671 F.3d at 645, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). The ALJ's failure to undertake the required analysis is a violation of the Agency's own rules, which requires remand of the ALJ's decision. *Prince v. Sullivan*, 933 F.2d 598, 602-03 (7th Cir.1991).

## Conclusion

On the basis of the foregoing, this case is hereby REMANDED to the Commissioner for proceedings consistent with this opinion. This remand is only for the period between May 11,

2011 and July 27, 2014, so as not to disturb the subsequent allowance of benefits.

Entered: November 29, 2016.

                                                                   s/ William C. Lee
                                                                   William C. Lee, Judge
                                                                   United States District Court